**\*NOT FOR PUBLICATION\***

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

ESTATE OF HENRY FAJGE, *et al.*,           :          Civil Action No. 11-cv-04527
                                           :
                                           :
                        Plaintiff,         :
                                           :                  OPINION
            vs.                            :
                                           :
                                           :
DICK GREENFIELD DODGE, INC.,               :
                                           :
                        Defendants.        :
_____:


WOLFSON, United States District Judge:

        This diversity action arises out of Dick Greenfield Dodge's ("DG Dodge's" or "Defendant's")

termination of Henry Fajge, which the Estate of Henry Fajge ("Plaintiff")[1] alleges was in violation

of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.* ("NJLAD" or "LAD").  The

complaint alleges three violations of the NJLAD—disability discrimination, age discrimination, and

retaliation.  Contending that Plaintiff cannot establish even a prima facie case for each claim,

Defendant moves for summary judgment on all three counts.  For the following reasons, Defendant's

motion is granted with respect to the age discrimination and retaliation claims and denied with

respect to the disability discrimination claim.

---

[1]     Fajge initially filed a complaint, Docket No. 10-cv-01874, on April 30, 2010.  Unfortunately, Fajge died during the pendency of that litigation.  His estate subsequently filed the instant suit based on an identical complaint.

## I.  BACKGROUND

### A.  Facts

When Fajge, then 62 years old, began working for DG Dodge as a car salesperson on February 23, 2010, he brought with him a significant medical history.[2]  *See* Def.'s St. at ¶ 3; Pl.'s Resp. at ¶ 3 (date of employment); Def. St. ¶ 2, Pl. Resp. ¶ 2.  He had a history of mini-strokes or transient ischemic attacks that dated back to 2006.  *See* Comprehensive Cardiology Report dated March 10, 2006, ECF 10-4 at Ex. E.[3]  He had also been diagnosed with coronary artery disease and hypertension.  *See* St. Mary Medical Center Discharge Summary dated Feb. 7, 2007, at Ex. G; Comprehensive Cardiology Report dated June 2, 2010, at Ex. M.  And, in or about August 2009, Fajge had suffered a heart attack.  *See* St. Mary Medical Center, Cardiac Catheterization Report dated Aug. 4, 2009, at Ex. H.

While employed at DG Dodge, Fajge's direct supervisor was John Miller, DG Dodge's sales manager.  Pl.'s Statement of Material Facts ("Pl.'s St."), ¶ 8; Def.'s Response to Pl.'s Statement of Material Facts ("Def. Resp."), ¶ 8.  Miller, in turn, reported directly to Jeffrey Reeb, DG Dodge's

---

[2]      Defendant argues that Plaintiff's medical evidence was not provided during discovery and, therefore, is not part of the record that can be considered on summary judgment  Def.'s Moving Br. at 3 ("The record does not disclose any medical diagnosis or expert opinion that Henry Fajge ha[d] any illness or infirmity which would qualify as a disability. . . . Plaintiff has submitted no expert report or opinion that [Fajge] suffer[ed] from any disability.").  Also, Defendant asserts that Fajge had not received a "definitive diagnosis of any health problem."  Def.'s St. at ¶ 9 (citing Dep. Tr. of Henry Fajge, 9:14-23 (stating that doctors did not make a definitive diagnosis, but informed Fajge that he probably suffered a stress-induced mini-stroke)).  Consequently, Defendant disputes the following facts to the extent that a diagnosis or condition is identified.

[3]      *See also* St. Mary Medical Center: Consultation Report dated March 27, 2006, Pl. Stat. at Ex. F; St. Mary Medical Center Discharge Summary dated Feb. 7, 2007, Pl. Stat. at Ex. G; Meridian Health/Jersey Shore Univ. Medical Center Report dated March 18, 2010, Pl. Stat. at Ex. J; Oxford Neurology Report dated March 29, 2010, Pl. Stat. at Ex. K; and Comprehensive Cardiology Report dated April 7, 2010, Pl. Stat. at Ex. L.

general manager.  Reeb Dep. 14:3-5.  Reeb Certification dated Nov. 30, 2011 at ¶ 1.  Fajge's duties

as a salesperson included meeting and greeting customers, walking customers through a sale, closing

sales, and following up with customers.  Pl.'s St. at ¶ 3; Def. Resp. at ¶ 3.

Prior to working for DG Dodge, Fajge had worked as a finance director at another car

dealership but he had never sold Chrysler vehicles.  Pl.'s St. at ¶¶ 4-5; Def.'s Resp. at ¶¶ 4-5.  In

light of Fajge's inexperience with Chrysler products, Defendant instructed Fajge to study employer-

provided product information rather than to take customers during his first few days of employment.

Pl.'s St. at ¶ 7; Def.'s Resp. at ¶ 7.  During his approximately six-week employment, Fajge sold at

least two cars.  Pl.'s St. at ¶ 32, 41; Def.'s Resp. at ¶ 32, 41; Defendant's Floor Logs at Ex. D

(showing the sale of a 2010 Jeep Liberty, a 2010 Caliber, and a 2010 Ram).

The  record  contains  several  disputes  concerning  Fajge's  job  performance.   Fajge's

supervisors Reeb and Miller testified during their respective depositions that Fajge did not meet

company expectations, and that Fajge spent a substantial amount of the work day in his office rather

than speaking to customers and selling cars.  Reeb Dep. 69:13-23; Miller Dep. 43:24 - 44:1-7.

Miller further testified that Fajge was often on the internet, and, on three occasions, he discovered

Fajge  looking  at  internet  pornography.   Miller  Dep.  44:2-7.   Reeb  echoed  the  pornography

accusation.  Reeb Dep. 24:19-23 ("I witnessed him on two occasions on the same night viewing

pornography on his computer.").  Additionally, Reeb testified that Fajge spoke to ten customers in

six weeks and that, in his view, this level of customer contact demonstrated that Fajge "sat in his

office all day long, [and] did nothing."  *Id.* at 69:13-23.  Lastly, both supervisors testified that they

verbally reprimanded Fajge for watching pornography and about his lackluster performance.  Miller

Dep. 45:2-18; Reeb Dep. 24:19-23.

In his 2010 deposition, taken before he passed away, Fajge disputed his supervisors' characterization of his work habits.  He testified that the practice of the sales department was for any salesperson to approach any customer at any time.  According to Fajge, the sales staff was not required to rotate customers so that all sales staff would have access to an equal number of customers.  *See* Fajge Dep. 20:6-20 ("It's an open floor, whoever will get to the customer first."). Moreover, he testified, five or six salespeople worked on an average day and the entire sales staff worked on Saturdays.  Pl.'s St. at ¶ 40; Def.'s Resp. at ¶ 40.  Consequently, Fajge testified, a salesperson may speak with only one customer during a day, and there were days when a salesperson does not speak to any customers.  Pl.'s St. at  ¶¶ 38-39; Def.'s Resp. at ¶¶ 38-39.

Fajge further testified that he would speak to customers in the service department waiting area when he did not have a customer on the sales floor, since a large service bill might induce someone to purchase a new car.  *See* Fajge Dep. 29:4-13.  In response to the accusation that he viewed pornography at work, Fajge vehemently denied looking at such material online; according to Fajge, he was "[t]oo old for that." *Id.* at 59:3-18. Fajge further testified that he was never reprimanded during his employment for any reason.  *Id.*

In Fajge's third week of employment, he suffered what he believes was a mini-stroke while at work.  Pl.'s St. at ¶¶ 13-14; Def.'s Resp. at ¶¶ 13-14.  Fajge, Miller, and another employee of Defendant were attending a Chrysler training session when Fajge became ill and an ambulance transported him to the hospital.  Pl.'s St. at ¶ 13; Def.'s Resp. at ¶ 13.  Miller accompanied Fajge to the hospital, staying with him in the emergency room.  Miller Dep. 49:2.  Fajge was hospitalized for five days.  Pl.'s St. at ¶ 14; Def.'s Resp. at ¶ 14.  Upon his release from the hospital, Fajge provided Defendant a doctor's note that authorized his return to work.  Pl.'s St. at ¶ 15; Def.'s Resp.

at ¶ 15.[4]  The note did not indicate that Fajge had medical restrictions on any of his activities.  Def.'s St. at ¶ 15; Pl.'s Resp. at ¶ 15.  Fajge testified that he told me Miller about his health, following this incident, and explained that he had been in the hospital before with mini-strokes.  Fajge Dep. 52:14, 22-24.  *See also* Miller Dep. 53:15-54:10 (referring to this incident as involving mini-strokes).

Within a week of Fajge's return to work, he again did not feel well at the office.  Pl.'s St. at ¶ 18; Def.'s Resp. at ¶ 18.  Miller instructed another employee to call for an ambulance for Fajge.  Miller Tr. 50:15-19.  What took place during the paramedics' interaction with Fajge is disputed.  Plaintiff testified in his deposition that the paramedics "asked [Fajge] his symptoms, took his pulse, checked his breathing, and told him he was fine."  Fajge Dep. 46:19-25.  Conversely, Miller testified at his deposition that Fajge lied to the paramedics about not having a history of mini-strokes, "refused treatment and refused to tell paramedics that he had any preexisting condition."  Miller Dep. 53:15-54:10.

Despite this disagreement as to the paramedics' examination of Fajge, the parties agree that the paramedics ultimately told Fajge that he was fine, Pl.'s St. at ¶ 20; Def.'s Resp. at ¶ 20, and further agree on the events that followed the paramedics' examination.  Miller persisted in asking Fajge if he wanted to be taken to the hospital—Fajge declined.  *Id*.  After the paramedics left, Fajge told Miller that he was going to drive home.  Pl.'s St. at ¶ 21; Def.'s Resp. at ¶ 21.  Miller expressed that he did not think that it was a "good idea," and insisted that a service manager drive Fajge home instead.  *Id*.

Also during his tenure at DG Dodge, Fajge requested time off from work though it is not

---

[4]      To be clear, Defendant disputes that Fajge's medical reports about this incident should be considered part of the summary judgment record.  However, Defendant does not appear to dispute that Fajge returned to work with a doctor's note.

clear from record if he made these requests before or after the aforementioned medical incidents.

Plaintiff's complaint asserts that Fajge requested time off from work for mental health reasons. *See*

Compl., ¶ 23 ("Plaintiff requested . . . . time off from work . . . for his mental health conditions.").

However, in his deposition, Fajge testified that he never requested a full day off from work on

account of a mental health condition:

> Q. Mr. Fajge, in the complaint that your attorneys filed for you, there is a statement, quote, Upon information and belief Defendant retaliated against Plaintiff for requesting this reasonable accommodation by terminating his employment.  And in Paragraph 23 of the Complaint it is alleged that you requested a very short period of time off from work for this mental health conditions.  Did you ever request that?
>
> A. No.
>
> Q. Okay.  So that would be incorrect?
>
> A. That is correct.
>
> Q. You never asked for time off from work?
>
> A. For mental, no.
>
> Q. You don't have any mental disability, do you?
>
> A. No.  I'm crazy by being in the car business, if you call that.
>
> Q. But you've never received treatment for mental illness?
>
> A. No. I don't know where that came from.

Fajge Dep. 60:14-61:13.

Moreover, Fajge further testified that the few times he requested to leave work early, the

reasons for his requests were not health related:

> Q. Did you ever make any requests of Mr. Miller or anybody else at [Defendant] to change your schedule in any way?

6

A. A couple times I asked if I can go home a little early, I am going to make up for it some other day.

Q. And what was the response?

A. Yeah.

Q. Go ahead, go home early?

A. Sure, yeah.  That was only once or twice.

Q. And why did you ask to go home early?

A. They were different reasons other than health reasons.  I don't remember what was the reason.

Q. Family commitment, something like that?

A. Yeah, whatever, yeah.

Q. Okay.  Did you ever make any other requests of anybody at [Defendant] about you job?

A. No.

Q. Did you ever ask for time off that was denied?

A. No.

*Id.* at 51:10-52:10.

Interestingly, however, Miller testified that he believed the reason that Fajge requested time off from work was, indeed, for health reasons:

Q. You recall that Mr. Fajge called out frequently?

A. Was he late frequently and did he – did he want to leave early frequently, yes, that was the problem with Mr. Fajge.  Not absences.

Q. When Mr. Fajge called out, did he give a reason why?

A. Well, I knew the reason why.  He just got out of the hospital.  I can't hold that against him.

7

Miller Dep. 70:2-12.  In short, the record contains several disputes regarding Fajge's request for time off from work.  However, it is clear from the record that Fajge did not request time off for health reasons.

On April 7, 2010, about two weeks after the paramedics came to the dealership at Miller's request, Defendant terminated Fajge.  Def.'s St. at ¶ 4; Pl.'s Resp. at ¶ 4; Miller Dep. 70:14-20.  The parties dispute how DC Dodge informed Fajge of his termination.  Fajge testified in his deposition that Miller called him the day after the paramedics were called to the dealership and stated, "I think this job is too hard for you.  I don't think you [sic] healthy enough for this job and as much as we like you, we are going to part company."  Fajge Dep. 43:23 - 44:4.  Moreover, Fajge testified, Miller told him that "I don't think you are strong enough or healthy enough for this job; no hours."  *Id.* at 50:22-24.

What Miller recalls from that conversation stands in contrast to Fajge's testimony.  Miller testified that the conversation was of a personal nature and unrelated to business; he called to "check on [Fajge]" and asked "about [Fajge's] health, about him taking care of himself and getting fixed."  Miller Dep. 55:2 - 56:24.  Notably, DG Dodge maintained a note in Fajge's personnel file dated April 7, 2010.  *Id.* at 59:14-17; Pl.'s St. at Ex. O.  The note states:  "Due to his inability to work the hours required Henry Fajge was let go today," and was signed by Miller.  Pl.'s St. at Ex. O; Miller Dep. 58:18-59:3.  Miller testified that he drafted the note so that he would have a "basic idea of what [transpired] and the reasons why [Fajge was terminated]."  *Id.* at 63:18-64:1.  Reeb, the general manager, further testified that the note was for unemployment purposes, to ensure that Defendant would not "fight" Fajge's unemployment.  Reeb Dep. 69:4-11.

DC Dodge ultimately replaced Fajge with another salesperson, Kenneth Felt, who was older

then Fajge.  Def.'s St. at ¶ 11; Pl.'s Resp. at ¶ 11.  Felt was 65-years-old at his hire date.  Reeb Cert.

dated Nov. 30, 2011 at ¶ 5.  As for Fajge, he obtained a salesperson position at Gateway Kia within

three weeks of his termination.  Fajge Dep. 62:2-6.  While employed at Gateway Kia, he did not

request or receive a disability accommodation to perform his duties there.  Def.'s St. at ¶ 7; Pl.'s

Resp. at ¶ 7.

### B.    Procedural History

Fajge originally filed a suit against DG Dodge, under the NJLAD, on April 30, 2010, and

the matter was assigned to the Honorable Judge Joel A. Pisano, U.S.D.J.  *See* Docket No. 10-cv-

1874, Compl.  On January 24, 2011, the Magistrate Judge issued a Scheduling Order, setting

February 15, 2011, as the closing date for fact discovery and February 25, 2011, as the due date for

dispositive motions.  Docket No. 10-cv-01874, Scheduling Order (Docket Entry No. 15).  Following

the close of discovery, on February 23, 2011, Defendant filed a motion for summary judgment.

Docket No. 10-cv-01874, Def. Motion for Summary Judgment (Docket Entry No. 16).  In opposing

the motion, Plaintiff submitted several pieces of medical evidence as exhibits alongside its

opposition.  Docket No. 10-cv-01874, Pl. Opp. Br.(Docket Entry No. 23).

This medical evidence, however, had not been provided to Defendant prior to the close of

discovery.  The parties now dispute the reason for the delayed production.  On the one hand,

Plaintiff asserts that Defendant "represented it was obtaining [Fajge's medical records] and never

provided [them] to Plaintiff."  Pl.'s Sur-reply Brief at 7.  Indeed, by letters dated September 28,

2010, Defendant requested Fajge's medical records from Jersey Shore University Medical Center

and St. Mary's Medical Center, and copied Plaintiff on the requests.  *Id*. at Ex. B.  Defendant, in

contrast, contends that Plaintiff failed to timely seek Fajge's medical records, waiting until after

discovery had closed to seek to obtain the records from Fajge's medical providers. Ltr. from Christine E. Burke, Esq. to St. Clare Med. Office Bldg. dated Mar. 7, 2011 (Kenny Cert., Ex. B).

The parties did not resolve whether Plaintiffs' reliance on the medical records to oppose summary judgment was appropriate because, unfortunately, Fajge passed away on March 24, 2011, and the summary judgment motion was never adjudicated. Thereafter, Fajge's estate notified Judge Pisano of Fajge's death, but did not substitute itself as plaintiff. Ultimately, Judge Pisano dismissed the complaint without prejudice because no motion for substitution was "made within 90 days after service of a statement noting the death of a party" in accordance with Fed. R. Civ. P. 25(a). *See* Docket No. 10-cv-01874, Order dated June 29, 2011 at 1.

On August 4, 2011, Fajge's estate filed the instant complaint. The Magistrate Judge conducted an initial conference with the parties on November 21, 2011. The parties did not engage in any discovery but, instead, proceeded directly to dispositive motion practice. On January 11, 2012, Defendant filed the same moving brief originally filed in the Judge Pisano in support of its motion for summary judgment in this case, and Plaintiff filed its same opposition brief with the accompanying medical record exhibits. As these papers mirror those in the prior litigation, Defendant's moving papers are silent on Plaintiff's reliance on the medical records.

Thus, Defendant first challenges Plaintiff's reliance on the medical records in Defendant's reply papers, even though the prior litigation placed Defendant on notice of this issue. In its reply, which appears to be a verbatim copy of the reply filed in the Judge Pisano action, Defendant argues that the records should not be considered in connection with the instant motion because Plaintiff failed to produce the records during discovery in the prior suit. *See* Def. Reply at 1 (stating that

discovery was concluded on February 25, 2011—the date discovery concluded in the prior suit). Once this argument was raised in the reply, Plaintiff sought leave to file a sur-reply, which leave was granted. Plaintiff argues Defendants should not be permitted to raise its challenge to the medical records in its reply brief; in Plaintiff's view, Defendant waived that argument by not raising it in its moving brief. I will address this issue in more detail *infra* but suffice it to say here that Plaintiff's reliance on the medical records does not alter my analysis. With the procedural history clarified, I turn now to the merits of Plaintiff's claims.

## II.    STANDARD OF REVIEW

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." *Kaucher*, 455 F.3d at 423. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue

of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.*; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005). Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   DISCUSSION

As noted, Plaintiff brings three claims:  a disability discrimination claim, a retaliation claim, and an age discrimination claim. I address each of these claims in reverse order, focusing last on the only count that requires in depth discussion—the disability discrimination claim. Both the

retaliation and age discrimination claim can be disposed of in a more summary fashion.

A.    **Age Discrimination**

Plaintiff asserts that Defendant terminated Fajge on account of his advanced age.  The Third

Circuit has articulated the requirements for establishing a prima facie case of discriminatory

discharge based on age under the NJLAD:

> To make out a prima facie case of age discrimination under the LAD,
> a plaintiff must show: (1) that he is a member of a class protected by
> the anti-discrimination law; (2) that he was performing his job at a
> level that met his employer's legitimate expectations; (3) that he was
> discharged; and (4) that he was replaced by someone sufficiently
> younger to give rise to an inference of unlawful age discrimination.

*Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 303 (3d Cir. 2004) (citing *Swider v. Ha-Lo Indus.*,

134 F.Supp.2d 607, 621 (D.N.J. 2001)).  *See also Nini v. Mercer County Community College*, 406

N.J.Super. 547, 554–55 (App.Div.2009), *aff'd*, 202 N.J. 98 (2010).

Defendant argues that Plaintiff was replaced with a sixty-four year old employee, Kenneth

Felt, and that, consequently, Plaintiff cannot establish the fourth element of the prima facie case of

age discrimination—that Fajge was replaced by someone sufficiently younger than he.  *See Nini*,

*supra* at 554-55 ("In the case of age discrimination, the fourth element require[s] a showing that the

plaintiff was replaced with a candidate sufficiently younger to permit an inference of age

discrimination.") (quoting *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 213 (1999)) (internal

quotation marks omitted) (alterations in original).[5]  Although Plaintiff agrees that Felt was older than

Fajge, *see* Def.'s St. at ¶ 11; Pl.'s Resp. at ¶ 11, Plaintiff further argues that a younger employee

---

[5]     While *Reynolds Reynolds v. Palnut Co.*, 330 N.J.Super. 162, 168 (App.Div.2000), states that
a plaintiff "need not show that he was replaced by someone sufficiently younger," that decision has
been subject to criticism.  *See generally Monaco,* 359 F.3d at 303 (explaining criticism of *Reynolds*).

hired only one week after Fajge was terminated provides a better comparison.  That employee, Joseph Kirkland, was 44 years old when he was hired around ten days after Fajge was fired.  *See* Kirkland Dep. 6:10-15; *id.* at 44:6-7.

However, Plaintiff has not presented any evidence from which a jury could conclude that Kirkland was hired to replace Fajge.  In its Answers to Interrogatories, Defendant designated Kenneth Felt as Fajge's replacement, Def. Ans. Interrog., ¶ 6, and Plaintiff has not pointed to any record evidence to contradict that designation.  That Kirkland was hired near in time to Fajge's termination does not mean, as a matter of fact, that he was hired to replace Fajge.  He may have been hired to fill a position that existed prior to Fajge's departure.  Thus, even viewing the record evidence in the light most favorable to Plaintiff, Plaintiff has failed to satisfy the fourth element of the prima facie case and summary judgment is appropriate based on that failure.  *Accord McDevitt v. Bill Good Builders, Inc.*, 175 N.J. 519 (2003) (affirming grant of summary judgment on age discrimination claim where "plaintiff failed to establish that the company retained a sufficiently younger worker in the same position as plaintiff").

That "[c]ourts have rejected age discrimination claims when a plaintiff was both hired and fired while a member of the protected age group" buttresses my holding. *See Young v. Hobart West Group*, 385 N.J.Super. 448, 461 (App. Div. 2005) (citing *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173, 175 (8th Cir. 1992)).[6]  When an employee is hired and fired at ages within the bounds of the protected class, a jury cannot reasonably conclude that age was a motivating factor in the

---

[6]     Of course, an inference of age discrimination may still be drawn where the person who fired the employee is not the same person who hired him.  *See DeWees v. RCN Corp.*, 380 N.J.Super. 511, 526 (App. Div. 2005).  Here, Plaintiff has not pointed to evidence that Fajge was hired and fired by different individuals.

employee's termination.  *See e.g.*, *Sanders v. FMAS Corp.*, 180 F.Supp.2d 698, 702 n. 7 (D.Md. 2001) ("Because Plaintiff was hired by Defendant at the age of 47 and was fired just a few months later at the same age, an age discrimination claim against Defendant is unsupportable.") *cited in Young*, 385 N.J.Super. at 461.  Hired at age sixty-two, Fajge was a member of the protected age group both when he was hired in February 2010, and when he was fired only two months later, in April 2010.  Thus, for all the above reasons, Defendant's motion for summary judgment on Plaintiff's age discrimination claim must be granted.

## B.    Retaliation

An employee must prove three elements to establish a prima facie case of retaliation under the NJLAD: 1) that he engaged in a protected activity known to the employer, 2) that he thereafter was subjected to an adverse employment decision by the employer; and 3) that there was a causal link between the two.  *Tartaglia v. UBS PaineWebber, Inc.*, 197 N.J. 81, 125 (2008).  *See also Viggiano v. State of New Jersey*, 136 Fed. Appx. 515, 517 (3d Cir. 2005) (citing *Weston v. Commonwealth of Pennsylvania*, 251 F.3d 420, 430 (3d Cir. 2001)).  If the plaintiff establishes a prima facie case of retaliation, the employer must come forward with a legitimate, non-retaliatory reason for the adverse employment action.  *See Henry v. New Jersey Dept. of Human Svcs.,* 204 N.J. 320, 330-31 (2010); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997)).

Plaintiff's Complaint alleges that Fajge requested a schedule change for a "mental health condition" and was terminated, in part, for that request.  Compl., ¶ 23-24.  Defendant points to Fajge's testimony in support of its motion for summary judgment where Fajge testified that he did not have a mental health condition, that he did not request a schedule change for health issues, and that none of his requests for time off, whatever the reason, were denied.  Fajge Dep. 51:10-52:10;

15

*id.* at 60:14-61:13.   In response, Plaintiff highlights Miller's testimony admitting that Fajge frequently requested to leave early and testified that he attributed these requests to Fajge's then-recent hospital stay.  Miller Dep. 70:2-12.

When an employee seeks an accommodation, his notice does not have to be in writing and it does not have to explicitly reference the phrase "reasonable accommodation."  "The law does not require any formal mechanism or 'magic words' to notify an employer that an employee needs an accommodation and circumstances will sometimes require the employer to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help."  *Coldwell v. Rite Aid Corp.*, 602 F.3d 495, 506 (3d Cir. 2010) (quoting *Taylor v. Phoenixville School District*, 184 F.3d  296, 313 (3d Cir. 1999)); *Jones v. United Parcel Service*, 214 F.3d 402 (3d Cir. 2000) (same).  Once the employee clearly expresses a desire for assistance based on a disability, the employer is obliged to engage in an interactive process to attempt to fashion an appropriate reasonable accommodation.  *Id.*  If the proposed reasonable accommodation would impose an undue hardship on the employer, then the employer does not have to accommodate the employee.  *Lasky v. Moorestown Twp.*, 425 N.J.Super. 530, 545 (App. Div. 2012).

Here, Fajge has not presented evidence from which a reasonable jury could conclude that he requested time off in an effort to obtain a reasonable accommodation for his health conditions. For one, the complaint refers to an accommodation for "mental health conditions" yet Fajge conceded in his deposition that he did not suffer from a mental health condition.  Compl., ¶ 23; Fajge Dep. at 51:10-52:10.  Additionally, the complaint states that the accommodation requested was "a very short period of time off from work, a period of less than a week."  Compl., ¶ 23.  Yet, the

record does not contain any evidence to support Fajge requested a "period of time off." *Id.* Rather, both Fajge and Miller testified that Fajge's requests were limited to leaving early or coming in late. Fajge Dep. at 51:10-52:10; Miller Dep. at 70:2-12. "Because there is no evidence from which a request for accommodation could be inferred, [Defendant] was under no legal obligation to engage in the interactive process [to fashion a reasonable accommodation]." *Jones*, 214 F.3d at 408. Furthermore, Fajge testified that DG Dodge granted all of his requests form time off from work. Fajge Dep. 51:10-52:10. Although Fajge's termination qualifies as an adverse employment action, Plaintiff has not met its burden in establishing that Fajge requested a reasonable accommodation for which Defendant could have retaliated against him.[5] Accordingly, Defendant's motion for summary judgment as to Plaintiff's retaliation claim is granted.

### C.    Disability Discrimination

New Jersey has adopted the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),[6] as the starting point in actions brought under the LAD. *Andersen v. Exxon Co., U.S.A.*, 89

---

[5]    Plaintiff focuses in its opposition brief on Fajge's requests to leave work early for health-related reasons.   Even if these requests demonstrate that Fajge requested a reasonable accommodation, the requests—which are not based upon a mental health condition— do not fit within the confines of the pleading as set forth in the complaint.  Plaintiff cannot amend its claim through argument in its opposition brief.

[6]    Under *McDonnell Douglas*, a plaintiff claiming unlawful discrimination must establish, by a preponderance of the evidence, a four-part prima facie case: 1.) he belongs to a protected class; 2.) he applied and was qualified for the position for which the employer was seeking applicants; 3.) he was rejected despite adequate qualifications; and 4.) after rejection the position remained open and the employer continued to seek applications for persons of plaintiff's qualifications. *Andersen v. Exxon Co., U.S.A.*, 89 N.J. 483, 492 (1982). Once a plaintiff has established the prima facie case, the burden of proof shifts to the employer who may rebut the presumption of discrimination by providing a legitimate, non-discriminatory reason for the rejection. *Id.* at 491. Then, the plaintiff may "prove by a preponderance of the evidence that the legitimate nondiscriminatory reason [ ] articulated by the defendant was not the true reason for the employment decision but was merely a pretext for discrimination." *Id.*

N.J. 483, 492 (1982). Though the *McDonnell Douglas* framework is followed in cases of discriminatory discharge, the elements of the prima facie case are modified to fit the circumstances. *Clowes v. Terminix Int'l., Inc.*, 109 N.J. 575, 596 (1998); *Bell v. K.A. Indus. Services, LLC*, 567 F. Supp. 2d. 701, 706 (D.N.J. 2008). In order for a plaintiff to establish a prima facie case of discriminatory discharge because of a handicap or disability, he must establish that: (1) he is disabled or perceived to have a disability;[7] (2) he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation by the employer; (3) he was terminated; and (4) the employer sought someone else to perform the same work. *Victor v. State*, 203 N.J. 383, 408-09 (2010).

Once the employee has satisfied his burden of establishing a prima facie case of discrimination under the LAD, the burden of production then shifts to the employer to rebut the prima facie case by "articulat[ing] some legitimate, nondiscriminatory reason" for its alleged unlawful action. *Clowes*, 109 N.J. at 596; *see also Laresca v. AT&T*, 161 F. Supp. 2d. 323, 335 (D.N.J. 2001). "In order to defeat a summary judgment motion if the employer answers the plaintiff's prima facie case with [a] legitimate, nondiscriminatory reason[] for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either 1) disbelieve the employer's articulated legitimate reasons; or 2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Laresca*, 161 F. Supp. 2d at 335-36; *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996), *cert. denied*, 521 U.S. 1129 (1997).

---

[7]     The NJLAD refers to "handicap," but defines handicap as a disability. Courts have used the terms interchangeably in this context. *See Victor v. State*, 203 N.J. 383, 399 (2010).

In short, when evaluating a plaintiff's discrimination claim, courts engage in the following three step process:

> (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant then must show a legitimate non-discriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.

*Henry v. Dep't of Human Servs.*, 204 N.J. 320, 331 (2010) (*quoting Dixon v. Rutgers,* 110 N.J. 432, 442 (1988)). In applying these factors, the New Jersey Supreme Court has treated federal precedent interpreting Title VII as "a key source of interpretive authority" for construing the NJLAD. *Woods-Pirozzi v. Nabisco Foods*, 290 N.J.Super. 252, 268 (App. Div. 1996). *See Alexander v. Seton Hall University*, 204 N.J. 219, 234-35 (2010).

### 1.    Plaintiff's Prima Facie Case

Defendant challenges the first prong of Plaintiff's prima facie case of discriminatory discharge, specifically arguing that Plaintiff failed to provide medical evidence during discovery and therefore cannot demonstrate that Fajge's medical issues qualify as a handicap under the LAD. In contrast, Plaintiff argues that record evidence establishes that Fajge was disabled. Alternatively, Plaintiff further argues that DG Dodge perceived him as disabled.

The threshold inquiry in a disability discrimination discharge case is whether the plaintiff fits the statutory definition of "handicapped." *Viscik v. Fowler Equip. Co.*, 173 N.J. 1, 15 (2002). The NJLAD definition of handicapped is as follows:

> "Handicapped" means suffering from physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing

> impediment, muteness or speech impediment or physical reliance on
> a service or guide dog, wheelchair, or other remedial appliance or
> device, or from any mental, psychological or developmental
> disability resulting from anatomical, psychological, physiological or
> neurological conditions which prevents the normal exercise of any
> bodily or mental functions or is demonstrable, medically or
> psychologically, by accepted clinical or laboratory diagnostic
> techniques. Handicapped shall also mean suffering from AIDS or
> HIV infection.

N.J.S.A. 10:5-5(g).

In lieu of demonstrating that the employee suffers from an actual disability, the employee may demonstrate that the employee perceived him as disabled. *Victor*, 203 N.J. at 410. Under the "perceived disabled" doctrine, it matters not that the employee does not actually suffer from a disability. *See Rogers v. Campbell Foundry Co.*, 185 N.J.Super. 109, 112-13 (App. Div. 1982). Court have reasoned that

> [i]t would defeat legislative purpose to limit the handicap provisions
> of the law against discrimination to those who are actually afflicted
> with a handicap, such as epilepsy, and exclude from its provision
> those perceived as having such a condition ... The law's application,
> therefore, should not be limited to those who actually have handicaps,
> excluding those who are discriminated against in the same way
> because they are only thought to have handicaps.

*Id.* (quoting *Barnes v. Washington Natural Gas Co.*, 591 P.2d 461, 465 (Wash. Ct. App.1979)). Thus, "those perceived as suffering from a particular handicap are as much within the protected class as those who are actually handicapped." *Cowher v. Carson & Roberts*, – N.J. Super. —, 40 A.3d. 1171 (App. Div. 2012).

As an initial matter, I address Defendant's challenge to Plaintiff's reliance on medical records that were not provided to Defendant during discovery in the initial action before Judge

Pisano that was brought by Fajge.[8]  Generally, under Rule 56, a party asserting a factual assertion must support that assertion by "citing to particular parts of materials *in the record*, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials ...."  Fed.R.Civ.P. 56(c)(1) (emphasis added).  Rule 56 does not expressly state that the documents cited to must have been produced in discovery.  Indeed, the affidavits permitted by Rule 56 are by their very nature documents containing factual averments that were not produced during discovery but were created for the purpose of seeking or defending against summary judgment.  *See Wright & Miller*, 10A Fed. Prac. & Proc. Civ. § 2722 (3d ed. 2010).

While Rule 56 does not expressly prohibit the submission of documents not provided in discovery, courts have precluded parties from relying on such documents.  In *A Slice of Pie Productions, LLC v. Wayans Bros. Entert.*, 487 F.Supp.2d 33 (D.Conn. 2007), for example, the court struck from the summary judgment record an expert report that had not been provided during discovery, reasoning that the late-disclosing party did not articulate good cause for the delay and that the party's "unjustified and untimely interposition of the [expert] Report [was] antithetical to efficient case management ...."  *Id.* at 39.  Other courts have rejected this "drastic" approach, concluding that striking such a report is unnecessary where there has been little prejudice to the other party. *See Reeves v. Coopchik*, No. Civ. 3:08-CV-1544PCD, 2009 WL 3571307, *3 (D.Conn.

---

[8]      While Defendant has not termed its challenge as such, I construe Defendant's request as one to strike the medical exhibits from the summary judgment record.  Accordingly, the Court looks to case law addressing motions to strike exhibits.  Defendant has not moved to strike under Federal Rule of Civil Procedure 37, which provides for sanctions (such as striking documents) against parties who fail to comply with their discovery obligations.  *See* Fed.R.Civ.P. 37(d)(1); *id.* at 37(b)(2)(A)(ii).

Oct. 27, 2009) (distinguishing *Wayans Bros.* on this basis).

In this case, Defendant's argument that it is prejudiced by Plaintiff's reliance on the medical records is incredulous.  For one, as explained above, Defendant was initially served with the documents in the initial Judge Pisano action.  True, those documents were provided after the discovery period *in that case* closed, that is of no moment here.  Defendant had the records in hand months before the instant suit was even filed.  Moreover, Defendant is well aware that there was no discovery conducted in this case; Defendant proceeded to file its motion for summary judgment without any discovery having taken place.  Thus, the Court finds it disingenuous for Defendant to cry prejudice when the documents were already in Defendant's possession.[9]

Plaintiff seeks to rely on the medical records of Fajge's mini-strokes, hypertension and coronary artery disease for good reason.  Heart conditions and strokes can be classified as physical disabilities under the LAD.  *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 404 n.2 (3d Cir. 2007) ("[p]hysical conditions that courts have accepted as meeting the LAD definition of disability include the aftermath of a heart attack.") (citing *Panettieri v. C.V. Hill Refrigeration*, 159 N.J. Super. 472, 388 A.2d 630, 634 (App. Div. 1978)); *see also Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 443 (2005).  And, the Third Circuit, in construing the NJLAD, has specifically held that coronary artery disease is a disability under the statute.  In *Sarnowski*, the circuit reversed a grant of summary

---

[9] Furthermore, if Defendant's raising of this issue in its reply brief to this Court is because Defendant simply re-filed the same briefs initially filed in the Judge Pisano action, without taking in account that the records had been received, and would surely be relied upon by Plaintiff, then this Court finds it necessary to highlight Defendant's ill-advised approach.  In this connection, the Court notes that Defendant's failure to raise the issue until its reply brief in this case also means that Defendant has waived its challenge to Plaintiff's inclusion of the medical exhibits in the summary judgment record.  *United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) ("It is well settled that [a party's] failure to identify or argue an issue in his opening brief constitutes waiver of that issue ....") (citing *In re Surrick*, 338 F.3d 224, 237 (3d Cir. 2003)).

judgment for failure to demonstrate a disability where the plaintiff presented medical records evincing a coronary artery disease diagnosis.  510 F.3d at 404.  Similarly, here, Plaintiff has presented a September 30, 2009 medical report from Dr. Andrew Solis, M.D. at Comprehensive Cardiology, indicating that Fajge was diagnosed with this same disease.  Pl. Stat., Exh. I.[10]

I need not rely on this medical evidence, however, because I conclude that Plaintiff satisfies the first element of the prima facie case by demonstrating that DG Dodge perceived Fajge as disabled and, thus, I do not express an opinion on whether Fajge was actually disabled.[11]  Under the NJLAD, the "perceived disability" doctrine applies when an employer believes the employee has "a physical or mental condition that would qualify the person as disabled under the NJLAD if the condition actually existed."  18 N.J. Prac. § 4:22.  As recently reiterated by the New Jersey Appellate Court in *Cowher*, *supra*  "those perceived as suffering from a particular handicap are as much within the protected class as those who are actually handicapped."  *Id.* at 1177.  So, for example, an employer who terminates an obese employee based upon the mistaken belief that the employee's weight prevents him from doing his job may be subject to NJLAD liability under a perceived disability theory.  *See Cowher*, *supra* at 1177-78 (discussing *Gimello v. Agency Rent-A-Car Syst., Inc.*, 250 N.J.Super. 338 (App. Div. 1991)).

Here, Plaintiff has provided sufficient evidence in the record to support the contention that

---

[10]    Defendant has not argued that this document is not authentic and, accordingly, has waived any challenge to the document's authenticity for purposes of this motion.  *See*  10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 2722, at 384 (3d ed. 2010) ("As is true with other material introduced on a summary judgment motion, uncertified or otherwise inadmissible documents may be considered by the court if not challenged.  The objection must be timely or it will be deemed to have been waived.").

[11]    Because I do not rule on whether Fajge was actually disabled, I also do not address Defendant's argument that expert testimony regarding Fajge's actual disability is required.

Defendant perceived Fajge as having an NJLAD-qualifying disability.  As explained above, Fajge testified in his deposition that Miller telephoned him the day after the paramedics were called to the dealership and stated, "I think this job is too hard for you.  I don't think you [sic] healthy enough for this job and as much as we like you, we are going to part company."  Fajge Dep. 43:23 - 44:4. Fajge further testified that Miller told him "I don't think you are strong enough or healthy enough for this job...."  *Id.* at 50:22-24.  While Miller would not confirm that he made these statements, he acknowledged that he called to "check on [Fajge]" and asked "about [Fajge's] health, about him taking care of himself and getting fixed."  Miller Dep. 55:2 - 56:24.  Moreover, DG Dodge maintained a note in Fajge's personnel file, signed by Miller, stating that "[d]ue to [Fajge's] inability to work the hours required Henry Fajge was let go today ...."  Pl.'s St. at Ex. O; Miller Dep. 58:18-59:3.  A jury could infer from these facts that Defendant believed Fajge had a disability that prevented him from performing his work duties.  Of course, the jury could also disbelieve Fajge's testimony and conclude that Defendant did not perceive him as disabled.  But that determination must be left to the jury and cannot be decided on summary judgment on this record.  *Accord Cowher*, *supra* at 1178 (reversing grant of summary judgment where record included statements by defendant making derogatory, anti-semitic statements to non-Jewish plaintiff, from which a jury could infer that the defendant perceived the plaintiff as Jewish).

Defendant argues Plaintiff cannot satisfy the "perceived disabled" test because Fajge testified that he did not experience any difficulties performing major life activities.  This argument misses the mark.  The NJLAD, unlike the Americans with Disability Act ("ADA"), does not require proof of such difficulties.  *See Victor*, 203 N.J. at 410 n.11 ("[T]he statutory definitions in our LAD are significantly broader than those in the ADA or in Section 504, both of which require that the

disability substantially limit a major life activity. We have described the difference by noting that, unlike the ADA, our LAD "is not restricted to 'severe' or 'immutable' disabilities.") (quoting *Viscik*, *supra* at 16)).

Citing *Kelly v. Drexel University*, 94 F.3d 102 (3d Cir. 1996), Defendant further argues that an employer's mere awareness of an employee's impairment does not demonstrate that the employer perceived the employee as disabled.  Putting aside for the moment that *Kelly* is an ADA, rather than an NJLAD, case, *Kelly* is distinguishable on its facts.  The plaintiff in *Kelly* argued that he suffered from a visually apparent limp and that his employer's awareness demonstrated that the employer regarded him as disabled.  The Third Circuit rejected this argument, responding that "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that [the] perception caused the adverse employment action."  *Id.* at 109.  Unlike the plaintiff in *Kelly*, Plaintiff here has pointed to facts, such as Miller's statement that "I don't think you are strong enough or healthy enough for this job....," from which a reasonable jury could conclude that Defendant did perceive Fajge as disabled.

### 2.     Non-Discriminatory Reasons for Defendants Actions

As stated above, if a plaintiff successfully establishes a prima facie case of discrimination, it creates a presumption of discrimination and the burden shifts to the employer to articulate legitimate, non-discriminatory reasons for its actions.  *Clowes*, 109 N.J. at 596; *LaResca*, 161 F. Supp. 2d at 335.  The employer, however, "carries the burden of production, rather than persuasion, of showing a legitimate, nondiscriminatory reason for its action."  *Greenberg v. Camden County Vocational and Technical Schools*, 310 N.J. Super 189, 199, 708 A.2d 460 (App. Div. 1998).  The employer need only present evidence sufficient to raise a genuine issue of fact as to whether Fajge

was discriminated against. *Id.* (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

While Defendant does not explicitly put forth their non-discriminatory reasons in its briefs, Defendant appears to argue that it terminated Fajge because of his poor job performance and for viewing pornographic materials on his work computer. There is some record evidence in support of these contentions. As noted, Fajge's supervisors Reeb and Miller testified during their respective depositions that Fajge did not meet company expectations, and that Fajge spent a substantial amount of the work day in his office rather than speaking to customers and selling cars. Reeb Dep. 69:13-23; Miller Dep. 43:24 - 44:1-7. Miller further testified that he discovered Fajge viewing internet pornography on three occasions. Miller Dep. 44:2-7. In addition, Reeb testified that Fajge spoke to no more than ten customers in six weeks and that this level of customer contact demonstrated that Fajge "sat in his office all day long, [and] did nothing." Reeb Dep. 69:13-23. Both supervisors also testified that Fajge was reprimanded for watching pornography and his lackluster performance. Miller Dep. 45:2-18; Reeb Dep. 24:19-23.

While Miller's and Reeb's testimony support Defendant's contention that it had a non-discriminatory reason for terminating Fajge, Plaintiff points to Fajge's testimony that contradicts both Miller's and Reeb's statements. In his deposition testimony, Fajge vehemently denies viewing obscene material at work. Fajge Dep. at 59:3-18. With regard to his alleged poor performance, Fajge further testified that he was never reprimanded by Miller or Reeb. *Id.* The competing version of events presented by the parties, and supported by sworn deposition testimony, could create a genuine issue of material fact. *See Fleming v. Corr. Healthcare Solutions, Inc.*, 164 N.J. 90, 102 (2000) ("Plaintiff's testimony is sufficient to create a genuine dispute about [a material] issue.").

26

*See also Waldron v. SL Industr., Inc.*, 56 F.3d 491 (3d Cir. 1995) (noting that a plaintiff's testimony may defeat summary judgment where both parties' evidence consists of the contradictory, self-serving testimony of interested witnesses); *Page v. Payless ShoeSource, Inc.*, Civ. Action No. 10–2793, 2012 WL 28786, * (D.N.J. Jan. 5, 2012) (concluding that plaintiff created genuine issue of material fact via her deposition testimony that prospective employer refused to hire her on account of the her race).   Nonetheless, I do not rest my summary judgment decision on this basis and, instead, assume for the sake of argument that DG Dodge has presented non-discriminatory reasons for its termination of Fajge.   Having so assumed, I now turn to whether Plaintiff has presented sufficient evidence that DG Dodge's proferred non-discriminatory reasons are pretextual.

### 3.    Pretext

"Once the employer sets forth a legitimate, nondiscriminatory reason for its adverse employment action, the burden again shifts to the employee to show that the employer's articulated reason 'was merely a pretext to mask the discrimination' or was not the true motivating reason for the employment decision."  *Greenberg*, 310 N.J. Super at 199 (citing *Kelly v. Bally's Grand, Inc*., 285 N.J. Super. 422, 430, 667 A.2d 335 (App. Div. 1995)).   A plaintiff meets this burden "by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (quoting *Texas Dep't of Community Affairs*, 450 U.S. at 256).   *See also Dorfman v. Pine Hill Bd. of Ed.*, 346 Fed.Appx. 825, 827 (3d Cir. 2009) (citing *DeWees v. RCN Corp.*, 380 N.J.Super. 511 (App. Div. 2005)).   To survive summary judgment, the plaintiff "need only point to sufficient evidence to support an inference that the employer did not act for its proffered non-discriminatory reasons." *Kelly*, 285 N.J.Super. at 431-32.   A plaintiff may accomplish this by demonstrating "weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons ... [from which it can be inferred] that the employer did not act for [the asserted]

non-discriminatory reasons." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994) *cited in Dorfman*,

346 Fed.Appx. at 828.  It is not enough for the plaintiff to merely "discredit the employer's proffered

reason [because] the factual dispute at issue is whether discriminatory animus motivated the

employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at

765.

Plaintiff challenges as pretextual Defendant's contentions that Fajge performed poorly and

that he viewed pornography while at work.  First, Plaintiff points to inconsistencies between Fajge's

supervisors' testimony and Defendant's employment records.  In its answers to interrogatories,

Defendant certified that Fajge sold two cars, Def. Ans. Interrog., ¶ 2, and General Manager Reeb

testified that Fajge sold either one or two cars, *see* Reeb Dep. 64:20-22.  However, DG Dodge's

floor logs show that Fajge sold three or four cars.  Pl. Stat., Exh. D (showing sale of a 2010 Jeep

Liberty on March 6, 2009; 2010 Caliber on March 8, 2009; same car on March 9, 2009 to same

owner; and 2010 Ram on April 5, 2009).  While the sale of even four cars may not have met

Defendant's sales expectations, that the Defendant does not appear to definitively know how many

cars Fajge sold lends some slight support to Plainiff's contention that his failure to sell a sufficient

number of cars is pretextual.

Second, Plaintiff argues that, even assuming Plaintiff's selling of one, two, or more cars

equates to poor performance, an inference of discrimination can be drawn from Defendant's decision

to terminate only Fajge when it admonished all of its employees for not selling more cars.  In

support of the contention that DG Dodge admonished all of its employees, Plaintiff cites to the

affidavit of Kenneth Felt—the older employee who replaced Fajge—who states that "during Saturday morning meetings, Defendant's management complained to all of its sales associates that overall car sales were down, and that salesmen were not 'making the numbers they needed to make." Felt Afft., ¶ 11.  I do not find Felt's affidavit relevant because he does not have personal knowledge of which employees were reprimanded while Fajge was still employed at DG Dodge; Felt was employed at DG Dodge beginning in May 2010, *id.* at ¶ 2, whereas Fajge was terminated in April of that year.  Plaintiff further points to DG Dodge's history of only firing one employee for lack of sales production in the five years surrounding Fajge's termination.  *See* Def. Supp. Resp. to Pl. Interrog. at 2, Pl. Opp., Exh. V.  As for DG Dodge's prior termination history, that fact provides further slight support for Plaintiff's contention that DG Dodge's proffered non-discriminatory reason is pretextual.[12]

Regarding the pornography viewing allegations, there is conflicting testimony in the record as to whether Fajge viewed such material.  As noted, Miller and Reeb testified at their depositions that they discovered Fajge viewing pornography on his computer while Fajge testified that he did not.  Viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could credit Fajge's testimony especially in light of the lack of any corroborating evidence to support Reeb's and Miller's self-serving assertions.  But this evidence is not particularly strong as Fajge's testimony is also self-serving.  Moreover, Reeb gave what could be viewed as inconsistent testimony regarding

---

[12]    Plaintiff further points to Fajge's testimony explaining why he was unable to sell more cars during his employment, *e.g.*, he had no pre-existing client base, there were days no customers visited the dealership.  I do not find this testimony supportive of Plaintiff's pretext argument, however, because, at best, it suggests that DG Dodge may have had unrealistic expectations of its new hires. To demonstrate pretext, Plaintiff needs to point to evidence suggesting more than mere incompetence.  Plaintiff must point to evidence of inconsistencies or contradictions relating to the employer's stated rationales.

his view of the importance of Fajge's viewing of the obscene materials.  Early in his deposition testimony, Reeb states that when he caught Fajge viewing pornographic images he "explained  to him that we don't do that here."  Reeb Dep. 24:19-23.  Later in deposition testimony, Reeb states that it was not "important to [him] what [Fajge] was looking at [on his computer] . . . [it was] the fact that [Fajge] didn't get out of his office and sell cars" that troubled Reeb.  *Id.* at 69:13-23.  While these two statements are not fully irreconcilable, and Reeb does not specifically reference the pornographic materials in the latter statement, a jury could nonetheless view the spirit underlying these statements as inconsistent.

The strongest evidence of pretext is Fajge's testimony that Miller told him, in a phone conversation the day after the paramedics were called, that he was not healthy enough to work.  *See* Fajge Dep. 43:23 - 44: ("Jon [Miller] called me and said, I think the job is too hard for you.  I don't think you [sic] healthy enough for this job and as much as we like you, we are going to part company.").[13]  Miller, in contrast, testified that he called Fajge to express his concern over Fajge's health and that they did not discuss work.  *See* Miller Dep. 56:4-24.  However, when Miller was asked at his deposition if he often called to check up on employees who were out sick, he responded "No.  But most employees don't like nearly drop over dead in front of me two times in a row in less than a month."  *Id.* at 56:11-13.  A jury could infer from Miller's use of the phrase "drop dead," and his concession that he does not usually call to express concern over sick employees, that Miller harbored a discriminatory animus toward Fajge, believing that Fajge was not fit to work.  Of course,

---

[13]     Plaintiff alternatively argues that, in light of this evidence, the case could proceed under a *Price Waterhouse* direct evidence method of proving discrimination.  I need not address the direct evidence method in light of my ruling *infra* that summary judgment is inappropriate under the *McDonnell Douglass* burden-shifting framework.  *See O'Brien v. Telcordia Technologies, Inc.*, 420 N.J.Super. 256, 262-63 (App. Div. 2011) (discussing direct evidence and the McDonnell Douglass, circumstantial evidence theory as alternate means of proving a discrimination case).

a jury could conclude the opposite—that Miller simply made a special effort to telephone Fajge because he was genuinely concerned about Fajge's health and that Miller did not believe Fajge was too unhealthy to work.  Viewing the evidence in the light most favorable to Plaintiff, however, Fajge's and Miller's deposition testimony supports Plaintiff's pretext argument.

Finally, the letter memorializing Fajge's termination that was kept in his employment file, when read in the light most favorable to Plaintiff, also lends support to Plaintiff's pretext argument. The letter states: "Due to his inability to work the hours required Henry Fajge was let go today." Pl. Stat., Exh. O.  This letter contradicts both of Defendant's proffered reasons for Fajge's termination.  By stating that he was let go "[d]ue to his inability to work the hours required ....," as opposed to due to his poor performance or viewing pornography, this letter could be interpreted by a jury to call into question the veracity of Defendant's proffered reasons.  When questioned about the meaning of the letter in his deposition, Miller testified that the "inability to work the hours" refers to that Fajge

> wanted to leave early.  He was frequently late.  That's the hours part of it.  The inability is the inability.  He wouldn't do it.  H[is] inability, [his] personal inability not to do [his work].  In other words, not his physical inability.  His willingness.

Miller Dep. 66:12-18.  He further testified that "inability" referred to Fajge's unwillingness "to take a customer," "to get off his desk," and to stop "looking at porn at his desk ...."  *Id.* at 60:12-20.

As with the testimony about the telephone conversation between Fajge and Miller, a jury could credit Miller's testimony that the letter was meant to encompass Fajge's poor performance and viewing of pornographic materials, but a jury could also reasonably conclude that the letter contradicts Defendant's proffered reasons.  Moreover, while Reeb testified in his deposition that this letter was drafted solely for unemployment purposes, his testimony also raises a credibility issue for

the jury to decide.  Therefore, I conclude that Plaintiff has presented sufficient evidence of pretext and, with Plaintiff having satisfied the *McDonnell Douglass* burden-shifting paradigm, Defendant's motion for summary judgment on Plaintiff's disability discrimination claim is denied.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted with respect to Plaintiff's age discrimination and retaliation claims.  Those claims are dismissed with prejudice. Summary judgment is denied with respect to Plaintiff's disability discrimination claim.   An Order consistent with this Opinion shall follow.

/s/ Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge

Date:   June 15, 2012